OPINION OF THE COURT
Michael D. Stallman, J.
Petitioner Grevirlene Kersellius, who was a police officer with the New York City Police Department (NYPD), suffered a hemorrhagic stroke while on duty. Her application for accidental disability retirement (ADR) was denied, and petitioner opted to retire instead on a service retirement and brought a CPLR article 78 petition challenging the denial.
By decision, order, and judgment dated December 14, 2015, this court granted her article 78 petition, annulled the denial of her application for ADR, and directed respondents to retire petitioner on ADR, retroactive to the date of her service retirement.
Respondents now move to renew and reargue this court’s decision, order and judgment dated December 14, 2015. Petitioner opposes the motion.
Background
The entire background of this article 78 proceeding was set forth in the court’s prior decision, order, and judgment, and is therefore not recounted here.
On June 20, 2010, petitioner, who was then an 18-year veteran of the NYPD, was about to end her shift when she heard a police radio report that there was an armed murder suspect at large. Petitioner volunteered to investigate and selected Police Officer James Atkins to be her driver. Atkins and Kersellius exited the patrol car, and Atkins noticed Kersellius holding her neck and heard her complaining of being light-headed. Atkins rushed Kersellius to St. Luke’s Roosevelt Hospital, where she was diagnosed with a ruptured aneurysm and brain hemorrhage.
In March 2012, Kersellius filed an application for accidental disability retirement, relying upon General Municipal Law *1019 § 207-k (the Heart/Stroke Bill). On August 8, 2012, the Police Pension Fund Medical Board (Medical Board) considered petitioner’s application. After an interview and physical exam, the Medical Board found that Kersellius was disabled from performing full police duty, but concluded that petitioner’s cerebral aneurysm was a congenital abnormality, which spontaneously ruptured.
On September 25, 2013, the Medical Board conducted its final review of petitioner’s ADR application, and reaffirmed its prior position. In that final review, the Medical Board cited a hospital record which the Medical Board found was documentary evidence that indicated that petitioner’s aneurysm ruptured before the radio call.
On February 12, 2014, the Board of Trustees of the Police Pension Fund, Article II denied petitioner’s ADR application, by a six-to-six tie vote. This article 78 petition followed. By decision, order, and judgment dated December 14, 2015, the court granted the petition (50 Misc 3d 935 [2015]). The court reasoned that respondents did not rebut the presumption granted under the Heart/Stroke Bill. Although respondents relied upon prior Heart Bill cases involving heart conditions where the presumption was rebutted, the court ruled that those cases did not apply to petitioner’s hemorrhagic stroke, because “respondents have not shown, from a medical standpoint, that petitioner’s stroke is similar to a heart condition, and that the evidentiary showing in the cases involving heart conditions would therefore be sufficient to rebut the presumption in this stroke case.” (Id. at 942.) Although the Medical Board concluded that petitioner’s aneurysm was congenital, this court ruled,
“To the extent that respondents argue, as in Matter of Hogg v Kelly, that the statutory presumption was rebutted because petitioner’s stroke was ‘associated with’ a congenital defect, i.e., the aneurysm, this argument presents the question of whether the Medical Board’s conclusion that the aneurysm was congenital was based on competent evidence.” (50 Misc 3d at 943.)
The court ruled that the Medical Board’s conclusion was not based on competent evidence, in accordance with Matter of Bitchatchi v Board of Trustees of the N.Y. City Police Dept. Pension Fund, Art. II (20 NY3d 268 [2012]).
Respondents now move to renew and reargue this court’s prior decision, order and judgment. While their motion was *1020 pending, the Appellate Division, First Department rendered its decision in Matter of Titza v Kelly (138 AD3d 498 [1st Dept 2016]), which appears to be the only other reported appellate case involving the presumption of the Heart/Stroke Bill and a stroke. By interim decision dated April 18, 2016, this court enlarged the record on this motion to include the issue of the applicability of Matter of Titza to this case, and directed the parties to submit supplemental briefs addressing its applicability.
I.
A.
Respondents contend that renewal should be granted because the court raised sua sponte the issue of whether cases involving heart conditions under the Heart Bill were applicable to a hemorrhagic stroke under the Heart/Stroke Bill. Petitioner’s counsel maintains that he did argue in his memorandum of law that the prior Heart Bill cases were distinguishable, as well as from all stroke cases where the Heart Bill case law was applied.[1]
“A judicial opinion should generally be read in light of its facts, and the precedential value of a judicial opinion is limited to the question presented by the facts of the case before the court. In other words, in applying cases that have been decided, what may have been said in an opinion should be confined to and limited by the facts of the case and should not be extended to cases where the facts are essentially different. When the facts are clearly different or new evidence has been added, the court must analyze the previous decision to determine the force and effect it should be given.” (1 Carmody-Wait 2d § 2:315 [footnotes omitted].)
*1021 Given that almost all but one of the prior reported Heart Bill cases involved heart diseases and heart conditions (none of which involved an aneurysm), it was incumbent upon this court to determine, as a threshold matter, whether those prior cases applied and should be extended to petitioner’s case, irrespective of whether petitioner challenged the applicability of prior Heart Bill cases. The facts in the record here appeared to indicate that the heart conditions involved in those prior cases and petitioner’s hemorrhagic stroke are not alike.[2]
Nevertheless, the court exercises its discretion to grant renewal to permit respondents to address the issue of how the prior cases involving heart conditions should be applied to a hemorrhagic stroke. In their answer, respondents asserted that “the stroke [petitioner] suffered was not accompanied by coronary artery disease or hypertension. Based on the legislative history of the Heart/Stroke Bill, this finding, alone, constitutes ‘competent evidence’ rebutting the presumption . . . .” (Respondents’ exhibit 13 [verified answer] ¶ 5.) Although respondents did not cite or submit any legislative history in their prior papers to support their, assertion, respondents now submit memoranda from the legislators who introduced the bill to add stroke to the Heart Bill. (2005 NY Senate-Assembly Bill S4458, A7395.) According to respondents, the memoranda reflect that the legislature intended for the same medical standard to apply for both stroke and heart disease.
The touchstone of whether the presumption under the Heart/ Stroke Bill is rebutted is whether there is competent evidence that “eliminated the possibility that the [disabling condition] was stress or job-related.” (Matter of Lo Pinto v Ward, 124 AD2d 497, 498 [1st Dept 1986].)
For a disabling condition caused by diseases of the heart of unknown origin, the lack of coronary artery disease or hypertension is sufficient to rebut the presumption. (Matter of Goldman v McGuire, 101 AD2d 768 [1st Dept 1984], affd 64 NY2d 1041 [1985]; Matter of Vallas v Safir, 304 AD2d 353 [1st Dept 2003]; accord Matter of Wholihan v Vanessen, 254 AD2d 492 [2d Dept 1998].) “That case [Matter of Goldman] holds that competent evidence which demonstrates that a heart condition which, in the absence of hypertension or coronary disease, is not stress related or induced by occupational factors is sufficient to rebut the statutory presumption.” (Matter of *1022 Gumbrecht v McGuire, 117 AD2d 531, 533 [1st Dept 1986].) Put differently, the lack of coronary artery disease or hypertension eliminates the possibility that the heart condition was stress-related or job-related.
Although it is now well-established that a disabling heart condition is not stress-related or job-related in the absence of coronary artery disease or hypertension, there was no such equivalent finding for hemorrhagic strokes in any prior reported cases. As discussed in the court’s prior decision, order, and judgment, Matter of Hogg v Kelly (93 AD3d 507 [1st Dept 2012]) appeared to be the only reported case at the time on the issue of the presumption of the Heart/Stroke Bill and a stroke. However, Matter of Hogg v Kelly involved an ischemic stroke, which was “associated with” congenital heart defects.
Respondents point to language in the memoranda from legislators who introduced the bill to add hypertension and stroke to the Heart Bill. The Introducer Memoranda in Support from Assembly Member Peter J. Abbate and Senator Martin Golden identically state, in relevant part:

“JUSTIFICATION:

“New York State already presumes under the law that any uniformed paid police officer or firefighter who successfully passed an entry level physical examination and subsequently developed a heart condition incurred such condition during the performance and discharge of their duty, unless proved to the contrary by competent evidence. Medical research shows that hypertension is job related for most first responders, including police officers and firefighters. Medical research has also determined that hypertension is a significant cause of heart attacks. In addition, current medical research indicates that hypertension may lead to a stroke at approximately the same rate as it leads to a heart attack. Consequently, strokes and hypertension should be presumed to be job related as well.
“In a study of over 50,000 persons, hypertensive patients had strokes at a higher rate than heart attacks. Because of their work effort, and involvement in serious and traumatic incidents on a regular basis, it is undeniable that police officers and firefighters regularly face a level of stress and hypertension that is far beyond the average person in our society.
*1023 “As indicated earlier, we have recognized that heart attacks and heart conditions developed on the job are often presumed to be job related and stress induced for police officers and firefighters. We should now further adjust this presumption to properly include the serious and related conditions of hypertension and stroke.” (2005 NY Senate-Assembly Bill S4458, A7395 [emphasis added].)
Petitioner’s reliance on the language about hypertension and stroke in the Introducer Memoranda in Support is misplaced. The issue presented before the court does not involve an issue of statutory construction, and respondents do not argue that the plain, ordinary meaning of “stroke” is somehow ambiguous. To the extent that respondents argue that the legislature intended “stroke” only to apply to strokes caused by hypertension,
“[a] general law may . . . originate in some particular case or class of cases which is in the mind of the legislature at the time, but, so long as it is expressed in general language, the courts cannot, in the absence of express restrictions, limit its application to those cases, but must apply it to all cases that come within its terms and its general purpose and policy.” (Matter of Di Brizzi [Proskauer], 303 NY 206, 214 [1951].)
Although the sponsors of the original bill to amend the Heart Bill might have had in mind strokes caused by hypertension, the court may not limit the plain and ordinary meaning of “stroke” to only those cases where strokes are caused by hypertension. “[L]egislative history cannot supply something that is just not in the statute.” (People v Miller, 18 NY3d 704, 709 [2012].)
Moreover, the original bills were amended, and the Senate version of the amended bills, which was passed by the legislature, added stroke to the Heart Bill, not hypertension. The Memorandum in Support from the New York State Senate for the bill that was passed states:
“JUSTIFICATION:
“New York State already presumes under the law that any uniformed paid police officer or firefighter who successfully passed an entry level physical examination and subsequently developed a heart condition incurred such condition during the performance and discharge of their duty, unless proved *1024 to the contrary by competent evidence.
“We should now further adjust this presumption to properly include the serious and related condition of stroke.” (Senate Mem in Support, L 2006, ch 654, 2006 McKinney’s Session Laws of NY at 2105.)
It is plain to see that the language concerning hypertension causing strokes was removed from the Memorandum in Support of the final version of the bill that passed.
It is true now, as it has been, that the Heart/Stroke Bill requires competent evidence to rebut the presumption that it grants. The addition of “stroke” to the Heart Bill did not excuse respondents from coming forth with such competent evidence to rebut the presumption of the Heart/Stroke Bill. Thus, respondents had to come forth with competent evidence that, in the absence of coronary artery disease or hypertension, petitioner’s hemorrhagic stroke was not stress-related or job-related. This they failed to do.
On this motion, respondents again have not offered any evidence-based reason that the prior cases involving heart conditions and hemorrhagic strokes are essentially the same, for the purpose of rebutting the presumption of the Heart/ Stroke Bill.
B.
Matter of Titza v Kelly (138 AD3d 498 [2016]) was decided after this court’s prior decision, order, and judgment, but it was decided while respondents’ motion was pending before this court. In Matter of Titza, the petitioner, a police officer, sought to annul the denial of his application for ADR benefits due to disabling strokes that he suffered. The Appellate Division, First Department unanimously affirmed the lower court’s judgment denying the petition, stating: “The statutory presumption in petitioner’s favor that his strokes were service related (General Municipal Law § 207-k) was rebutted by credible evidence that the etiology of his strokes was unknown, petitioner does not suffer from coronary artery disease, and there was no evidence of hypertension.” (Matter of Titza, 138 AD3d at 498.)
Respondents argue that Matter of Titza supports respondents’ position, that the presumption afforded under the Heart/ Stroke Bill to an applicant who suffers a disabling stroke is sufficiently rebutted if such stroke is unaccompanied by hypertension or coronary artery disease.
*1025 Petitioner’s counsel, who also represented the petitioner in Matter of Titza, argues that Matter of Titza is distinguishable, and submits the record on appeal from Matter of Titza. Petitioner’s counsel states that, unlike petitioner in this case, who apparently suffered a stroke while responding to a report of an armed murder suspect at large, Titza suffered a stroke while he was at home in bed. (Goldberg supp brief ¶ 4.) Petitioner’s counsel also indicates that Titza suffered an ischemic stroke, whereas petitioner suffered a hemorrhagic stroke. (Id. ¶ 5.)
As discussed in this court’s prior decision, order, and judgment, “there are two kinds of stroke: (1) an ischemic stroke, caused by a blood clot that blocks or clogs a blood vessel in the brain, and (2) a hemorrhagic stroke, which is caused by a blood vessel that breaks and bleeds into the brain.” (50 Misc 3d at 942.) This court noted, but did not address, “the issue of whether, for the purpose of the Heart/Stroke Bill, an ischemic stroke should be regarded as the same as a heart attack.” (Id. at 942 n 9.)
Matter of Titza clearly treats an ischemic stroke of unknown etiology as the same as other heart conditions of unknown etiology, for the purpose of determining whether the presumption of the Heart/Stroke Bill is rebutted. Thus, Matter of Titza holds that, for an ischemic stroke of unknown etiology, the presumption is rebutted in the absence of coronary artery disease and lack of hypertension. Put differently, Matter of Titza ruled that the clot in Titza’s brain, which was of unknown origin, was not stress-related or job-related, because such stress or occupational factors would also have produced telltale signs of blockages in his coronary arteries or chronic hypertension.
Because Matter of Titza did not involve a hemorrhagic stroke, the court is not persuaded that Matter of Titza controls in this case. Applying Matter of Titza and the previous Heart Bill cases to petitioner’s hemorrhagic stroke is tantamount to a finding that petitioner’s aneurysm or its rupture was neither stress-related nor job-related, because petitioner’s level of stress did not also produce stress-related pathology. Without any factual support from a medical expert, this court is unwilling to apply those cases to the instant case.
In sum, the branch of respondents’ motion for renewal is granted, and upon renewal, the court adheres to its prior decision, order, and judgment.
*1026 C.
As to reargument, respondents contend that the court overlooked a relevant finding of the Medical Board, which found no evidence that petitioner suffered any trauma or injury to the head, and overlooked that competent evidence and facts in the record supported the Medical Board’s findings that petitioner’s aneurysm was congenital and spontaneously ruptured.
The prior decision, order and judgment states,
“The Medical Board concluded that petitioner’s aneurysm was congenital by ruling out other possible causes of the aneurysm. That is, the Medical Board found no history of hypertension, no infections or tumors, no vascular disease or atherosclerosis, no history of cigarette smoking, and no drug abuse. However, the conclusion of the Medical Board that petitioner’s aneurysm was congenital was based on conjecture; the conclusion assumes that the causes of petitioner’s aneurysm that the Medical Board considered was an exhaustive list. Neither is there any explanation from the Medical Board, supported by a credible source, as to why the absence of these possible causes of petitioner’s aneurysm eliminated the possibility that petitioner’s stroke was stress or job-related.
“Even if petitioner’s aneurysm were congenital, the Medical Board’s conclusion that The aneurysm ruptured spontaneously’ is not supported by any credible source, but rather is based on speculation.
The Medical Board did not reference any literature or data to support its conclusion of a spontaneous rupture.” (50 Misc 3d at 945-946 [citations omitted].)
As respondents indicate, known causes of a cerebral aneurysm were set forth in a “Cerebral Fact Sheet” of the National Institute of Neurological Disorders and Stroke (NINDS), which petitioner submitted to the Medical Board. The “Cerebral Fact Sheet” states, in pertinent part:
“Cerebral aneurysm can be congenital, resulting from an inborn abnormality in an artery wall. Cerebral aneurysms are also more common in people with certain genetic diseases, such as connective tissue disorders and polycystic kidney disease, and certain circulatory disorders, such as arteriovenous malformations (snarled tangles of *1027 arteries and veins in the brain that disrupt blood flow).” (Respondents’ exhibit 17.)
The “Cerebral Fact Sheet” also states that known causes include, among other possible causes, trauma or injury to the head.
The court’s prior decision, order and judgment stated that “[t]he Medical Board concluded that petitioner’s aneurysm was congenital by ruling out other possible causes of the aneurysm” on the “Cerebral Fact Sheet.” The fact that the court did not recite verbatim each and every one of the Medical Board’s findings does not mean that the court overlooked the Medical Board’s specific finding that there was no evidence that petitioner suffered trauma or injury to the head.
Contrary to respondents’ contention, the court did not find that NINDS was not a credible source. Rather, respondents had the burden of “coming forward with affirmative evidence to disprove causation.” (Matter of Bitchatchi v Board of Trustees of the N.Y. City Police Dept. Pension Fund, Art. II, 20 NY3d 268, 282 [2012] [emphasis added].) The NINDS “Cerebral Fact Sheet” fell short of the Bitchatchi standard; the “Cerebral Fact Sheet” did not state that the causes of cerebral aneurysm listed on the fact sheet were exhaustive. Indeed, along with the “Cerebral Fact Sheet,” petitioner also submitted to the Medical Board information from the American Stroke Association about cerebral aneurysms, which states, in relevant part,
“How do aneurysms form? Are people born with an aneurysm?
“People usually aren’t born with aneurysms. Most develop after age 40. Aneurysms usually develop at branching points of arteries and are caused by constant pressure from blood flow. They often enlarge slowly and become weaker as they grow, just as a balloon becomes weaker as it stretches .... They may run in families, but people are rarely born with a predisposition for aneurysms.” (Respondents’ exhibit 10 [vol TV], footer exhibit H.)
And yet the Medical Board appeared to treat the “Cerebral Fact Sheet” list as exhaustive, without any explanation. That is quintessential conjecture. The “Cerebral Fact Sheet” does not state that, if the other causes of cerebral aneurysm are not present, then the cerebral aneurysm is likely congenital. The Medical Board did not find any congenital indicia noted in the “Cerebral Fact Sheet”: the Medical Board did not find any *1028 abnormality in an artery wall; neither did the Medical Board find evidence that petitioner had any genetic diseases, poly-cystic kidney disease, or circulatory disorders.
On this motion, respondents also indicate that petitioner’s hemorrhagic stroke was a subarachnoid hemorrhage and cite to the Consumer Version of the Merck Manual (online), which states,
“Subarachnoid hemorrhage is considered a stroke only when it occurs spontaneously — that is, when the hemorrhage does not result from external forces, such as an accident or a fall. A spontaneous hemorrhage usually results from the sudden rupture of an aneurysm in an artery in the brain. Aneurysms are bulges in a weakened area of an artery’s wall. Aneurysms typically occur where an artery branches. Aneurysms may be present at birth (congenital), or they may develop later, after years of high blood pressure weaken the walls of arteries. Most spontaneous subarachnoid hemorrhages result from congenital aneurysms.” (Merck Manual Consumer Version, Subarachnoid Hemorrhage, http ://www.merckmanuals. com/home/brain, - spinal-cord,-and-nerve-disorders/stroke-cva/ subarachnoid-hemorrhage [accessed Sept. 9, 2016].)
To the extent that respondents are now resorting to the Internet for competent expert medical testimony that petitioner’s aneurysm was congenital, reargument is denied. The Medical Board did not consider the information contained in the online Consumer Version of the Merck Manual (a professional version exists as well), and respondents did not present such information in their prior papers. “Reargument is not designed to afford the unsuccessful party successive opportunities to reargue issues previously decided or to present arguments different from those originally asserted.” (William P. Pahl Equip. Corp. v Kassis, 182 AD2d 22, 27 [1st Dept 1992] [citations omitted].)
The court did misapprehend the finding of the Medical Board that petitioner’s aneurysm ruptured spontaneously. The court understood the Medical Board’s finding that the aneurysm ruptured spontaneously to mean that the aneurysm ruptured on its own, for no apparent reason. On this motion, respondents explain that a “spontaneous” rupture is a term of art, which simply means that the rupture was not caused by external forces. (Respondents’ mem at 17.) It is undisputed that petitioner did not incur any head trauma or injury.
*1029 Therefore, reargument is granted, and upon reargument, the court vacates that portion of its decision that ruled that “the Medical Board’s conclusion that ‘the aneurysm ruptured spontaneously’ is not supported by any credible source, but rather is based on speculation.”
Nevertheless, the court otherwise adheres to its prior decision, order, and judgment. The finding that the aneurysm did not rupture due to trauma, or head injury, or other external forces does not alter the court’s prior conclusion: respondents did not come forth with sufficient affirmative evidence to disprove that the rupture of the aneurysm was job-related or stress-related.
II.
Accordingly, it is hereby ordered that the branch of respondents’ motion for renewal is granted, and upon renewal, the court adheres to its prior decision, order, and judgment; and it is hereby ordered that the branch of respondents’ motion to reargue the court’s prior decision, order and judgment dated December 14, 2015 is granted, and upon reargument, that portion of its decision that ruled that “the Medical Board’s conclusion that ‘the aneurysm ruptured spontaneously’ is not supported by any credible source, but rather is based on speculation” is vacated, and the court otherwise adheres to its prior decision, order, and judgment.

. Petitioner’s memorandum of law states, in relevant part:
“Respondents will undoubtedly argue that a Stroke Bill applicant must demonstrate their disability is the result of coronary artery disease to be entitled to the presumption .... These cases are superseded by Bitchatchi, supra, and its progeny; as well as the First Department’s latest case in respecting GM[L] § 207-k, Matter of Ploss v Kelly, 113 AD3d 531 (1st Dept, 2014 [2014]).” (Respondents’exhibit 11 [volIV] [petitioner’s mem of law] at 15-16.)

. Respondents themselves relied upon a web page from the U.S. National Library of Medicine, part of the National Institutes of Health, which states that a hemorrhagic stroke “is caused by a blood vessel that breaks and bleeds into the brain.” (Respondents’ exhibit 16 [vol V] [mem of law] at 2 n 2.) The heart conditions in the prior cases did not involve any aneurysms, such as an aortic aneurysm, that ruptured.